Good morning. I'm Larry Henry Moore. I represent Peabody Twentymile Mining. Could you pull the mic up closer to you so we can hear you? Great. I represent Peabody Twentymile Mining, LLC. This case involves one citation issued by the Mine Safety and Health Administration for an alleged violation of 30 CFR 75333E1. The issue is the sealant that is used to seal the perimeter of a concrete block stopping. These stoppings are constructed to separate airways, to separate intake air from return air and intake air from belt air and the like. Peabody builds these stoppings. They essentially use two kinds of stoppings. One is a concrete block stopping that is 8 inch blocks. They are dry stacked. They are coated on one side with an approved strength enhancing bond or sealant, if you will. And then they are sealed around the perimeters with a polyurethane grout. And it's the perimeter seal that's at issue here, right? Yes. We should keep in mind throughout this that the face of the stopping has this strength enhancing bond on it. They have been building stoppings this way since the 1980s. It has been approved in their ventilation plans repeatedly. 1983 plan, you can argue it might be ambiguous. 1991, Lincoln Derrick, who submitted the plan, testified it was very clear what he was intending. Did it say polyurethane? Did the plan specify the type of sealant that you were using around the perimeter? They had a portion of the plan that addressed polyurethane foam. And it said foam application for ventilation devices will be limited to sealing cracks and perimeters of ventilation devices. So it specifically said the foam. That whole page of the plan is directed to polyurethane foam because there are handling issues and there are ventilation issues. And this was the one provision that addressed the use of the foam. The ALJ, and the foam is flame resistant. And that's approved by MSHA. We didn't make it up. It's got a flame spread index of 25. The ALJ upheld the citation. It went up to the Federal Mine Safety and Health Review Commission. And they decided in a two-to-two decision that they would affirm it. Because when they're split equally, that's what happens. This case, I think, comes down pretty much to the plain language of the standard. It talks about a traditionally accepted method of construction. We believe that there really isn't any lack of clarity on that. Well, excepted by who? Excepted where? In the mining context, there isn't any doubt. We're not building stoppings that MSHA doesn't know about and doesn't approve. It's accepted by MSHA and has been specifically since 1991, but probably before that. When the Secretary tries to create ambiguity here about the word excepted, the problem with that is you don't build a stopping in your mind without active involvement by MSHA in approving your method of construction. If you look at that, despite the mandatory standard talking about traditionally accepted methods, it's in the plan. And so we all understand these plans are essentially mandatory standards. And they are mandatory standards. We cited in our brief both the Prairie State case, the mock mining case, and the 1969 Act case, the Ziegler case. They are evaluated under an arbitrary and capricious standard if there is a dispute, and essentially the plans are MSHA's plans. Cancel. Can I just get you to address the preamble language, though, that says traditionally accepted. Here's our list, and you're not on the list. Does that not create an ambiguity? Well, and I apologize because I think I misstated before the commission. We are on the list, but it's not specific enough because they refer to And which subsection is that? It's like the third in the list. And it doesn't talk about sealing the perimeter. Now, interestingly, the preamble talks about sealing the perimeter with mortar on lightweight, concrete, cementitious, black stoppings. It doesn't reference the perimeters here. We all know preambles aren't binding. I'm sorry, so do you think it's not significant that you're making the argument now that you appear on the list? Well, we're on the list, but it's not specific enough to give you an answer. I will have to tell you, when we went to trial, we had a series of approved ventilation plates. To my way of thinking, that trumps any argument that it's not traditionally accepted because it's in an approved plan, it's accepted by MSHA, and has been for years. Well, to put it a little differently, though, I guess you're saying you're traditionally accepted not because you're on the list, but because you have been in the past. Right, yes. It's a matter of fact, in essence, that the standard was promulgated in 1996. Long prior to 1996, we were building stoppings this way, and it was approved by MSHA then, and it's been approved since. The reviewing commissioners, the two who would have reversed, mentioned that there are six-month plan reviews, and they are repeatedly reviewed. So while you can argue one way or the other about the preamble, it seemed to me indisputable that it's approved in the plan, it's accepted, that's within the definition. And the secretary concedes we've been using these, MSHA's accepted them, it's been in the plan, and we get inspected all the time. I mean, when we're talking about inspections, we're talking about probably 400 inspection shifts a year at a mine like 20 mile. Maybe it gets to be so humdrum, you really don't even look anymore. You just think, oh my God, here we go. Check the box. I think we've cited... Finally somebody actually looked. I think we've cited enough cases where it's not a check the box, we're walking through the mine, sleepwalking. The other thing is, the two of the inspectors who apparently had changed their minds, both inspected this mine. And Mr. Preece, who is, was the assistant district manager accompanying the inspector here, has cited the issue of polyurethane grout and the storage of grout on previous occasions. And he's well aware of what it was used for. He talked about it at a hearing, and his testimony was cited in a case we've cited in our brief, where he knows what they were using it for. It wasn't a surprise. And the fact that 1996 to 2014, it's almost 20 years, all of a sudden they had this revelation. I would submit to you that the only difference here, perhaps, is a new district manager. And that I don't know, because we don't have any record evidence of that. I mean, there was a new district manager, but his involvement is not identified. Well, that's all well and good. I need to take you back, though. What are we to do with the fact that what you're arguing isn't ambiguous when you were on the list and then it disappears from the list? Doesn't that cause some kind of ambiguity as you were there, or the item was there, and now it's gone? Well, it's still in the preamble, but what was never gone until this citation was issued, it was in the plan. And we know that MSHA was paying attention in the plans, because if you look at the evolution of the plan from the rather simple one sentence that Mr. Derrick submitted back in 1991 to see how it's evolved. And the reason it evolves is somebody at MSHA says, well, I think you ought to put this in there, or I think you ought to put this in there. The traditional method of doing something, does that encompass a period of time at all to you when you're saying that? To me, it does. What is a traditionally accepted method? Doesn't that encompass a passage of time? I mean, what's gone on for ten years? Even though now all of a sudden the language disappears, isn't there still the possibility of being able to show that it is a traditionally accepted method by the use and the passage of time? I think that is, in fact, what we have here. There was a passage of time, and that it was accepted before, and it was accepted after by MSHA. Okay, well, where I'm going with this is that with the maze of what's happening here, isn't there ambiguity in trying to figure out what's what and how we should go about it? And once there's a determination of ambiguity, the ALJ said, I'm going to go this way with it. And then the deference comes in. I don't think there is ambiguity because of this. The language of the standard didn't change. The basic language of the approved plan didn't change. If you want to look at the preamble, the preamble didn't change. Well, then how did you lose it? We had one inspector who was making his first underground mine inspection and his supervisor, and for whatever reason they decided to cite it. And once they cited it, MSHA pursued it when 20 Mile challenged it. There is nothing in this record that shows what was going on within MSHA as such, and that's, I'll go beyond the inspector, because the inspector's, my guess is he's doing what I said. That was my guess. But there's no discussion of why they decided to do this. And what we have after the fact is what I think are attempts to justify what they did. You have Mr. Priest saying, well, I think the plan is ambiguous. Well, he wasn't involved in the planning process. And then we have Mr. Priest and Mr. Grossly saying, well, the inspectors out of the Craig Field Office are either untrained or stupid. And that's a word I've never applied to people who work for MSHA. So there isn't, all we have is post hoc attempts to justify it. And there's simply, there is nothing in this record to say MSHA went through a process as to why they thought this didn't work anymore. Maybe they were concerned about strength, strength of the poly. I mean, I think that's a consideration here, isn't it? That Mr. Priest might have been, but I don't know whether the agency as such was. The test that's referenced in the standard as an alternative test is a test that is done with the ends of the, whatever your device, whatever wall or anything you're testing, unrestrained. Well, that's essentially Well, it's traditionally accepted methods and of materials shown to have minimum strength equal to or greater than traditionally accepted in mind control. Well, and then our belief is the strength is adequate. One of the things, there's a comment. What's the standard purpose? It's to separate airways. And that means it should, all stoppings no matter what, no matter how they're built, but it should do the job of separating airways. And it's been doing that at 20 miles for a long time. Thank you. You're out of time. Yes, I know. I'm sorry. Thank you. May it please the court. Emily Toler for the Secretary of Labor. I'd like to start with Kibari's interpretive argument, which is essentially that because it has broken the law for many years, it should be allowed to continue doing so. Well, I don't think that's their argument. I think that they have been doing this over and over and you've approved it. Can I get you to address that? I suppose that's a question about the plan. Well, maybe there are two ways of approaching that. Well, can't they rely on years of prior approval to continue to use the same method that they've used for so many years? Well, this court in the mainline Rock and Ballast case cited in our brief explicitly held that the mine operator may not rely on the conduct of government agents to determine whether it's in compliance with the law. But here we're interpreting the term traditionally. So that there does seem to be a period of time where they were permitted to do this. So help me understand. I guess maybe you're, just tell me why that doesn't meet the definition of traditionally accepted. I think there's a distinction between acceptance and not noticing. So this is a bit of a simplification, but for example, if you didn't notice that your dog was eating your shoes, that wouldn't mean that you had accepted the fact that the dog had been eating your shoes. That doesn't get me anywhere. You better try another example. I don't think there's any case law that has ever held that an MSHA's inspector's failure to issue citations constitutes an interpretation or constitutes acceptance. And in fact, the case law is to the contrary, that once a government agency discovers a violation of the law, it can't be stopped from enforcing it. And I don't see... And what exactly are you claiming is the violation of law here? Not doing it in the traditionally accepted method? Is that the violation? The violation is failing to seal the perimeter of the block stoppings using mortar or some strength enhancing sealant. Yes. So you just read out the traditionally accepted method. No, I believe more specifically the agency's position is that the traditionally accepted method of building block stoppings is sealing the perimeter of block stoppings with mortar, which can be covered with foam. And the assistant district manager and other MSHA personnel testified to that fact at the hearing, that stoppings simply aren't built, or block stoppings at least, just aren't built with foam as the only sealant. So you do believe that up until that time it was permissible for them to do that, but then there was a change that then justified the issuance of the citation here? I don't think that it was ever permissible for the mine to use exclusively foam to seal the edges of its block stoppings. The 1983 ventilation plan, which was approved when the mine first became operational, specifically explained how to build block stoppings, and it said they are to be built dry stacked and sealed with mortar mix or an approved sealant. And polyurethane foam was not then, and has never been, an approved sealant on its own to seal the perimeter of block stoppings. I don't think also that the ventilation plan is nearly as clear as Peabody thinks it is. It's our position that because the original ventilation plan specifically explained how block stoppings should be built, and specifically excluded foam as being the only sealant for them, that the subsequent ambiguous... Well, it didn't specifically exclude, it just didn't list. It wasn't included. It didn't say, did it, that you cannot use polyurethane foam? That's correct. It simply said mortar mix or approved sealants, and the list of approved sealants did not include polyurethane foam. Now, one other question, and I'll try to let you argue. They referred to another mine. Is the procedure that they got cited for in the Peabody, in this particular instance, has that procedure been continued in another mine? I got that somewhere in my reading, and that it was never, and they've never been cited for that. I'll take my best guess at the testimony that you're referring to, Judge Volokh. One of Peabody's witnesses testified that in his experience there was another mine that built stoppings this way, but wasn't cited. I don't have an explanation for if that occurred, why it did, but I will point out that other than that, Peabody's witnesses only testified about the way stoppings were built at that mine, and they testified that it's not done that way in other mines. Thank you. You answered that for me. I also want to follow up a little bit, Judge Wisco, on a point that you made, which is kind of just the obviousness of the violation here. It's true that there are a lot of stoppings in the mine. It's true that MSHA inspectors look at these stoppings, probably with varying degrees of caution, because, again, it is permitted for the mine to seal the perimeters with mortar and then use foam on top of that. And so when the inspector's walking around and he sees foam at the edges of the stopping, that's not going to instantaneously throw a red flag for an inspector. And in fact, the testimony in this case from both Priest and Grossly, once they looked at photographs of the stoppings in the mine, was, I would not have issued a citation if I had just looked at this. And instead it took 18 ADM Priest actually peeling away the foam to reveal that there was no mortar underneath for him to issue the citation in the first place. So this is not a case where MSHA has been walking around for 20-odd years looking at these things every day and just winking and nodding and saying, yeah, yeah, go ahead. That's not the case. This violation took a little more scrutiny to detect. And I think it's... So is it your argument, then, that this violation was one that continued from the very inception for over 20 years? I don't know when the mine stopped. My question is, is that your argument, that while they didn't wink and nod, but what was going on was a violation of the regulations since its inception? Since 1996, yes. That is our position. I suppose it's possible that if mortar stopped being used after 1996, then that would be when the clock kind of started to run. But Peabody was always required to seal its block stoppings with mortar and optional foam. And the moment that stopped being the case, that was when the violation occurred. And we don't know when that started. I mean, it could have been 96. It could have been later. I think that's true. I mean, you wouldn't know until you peeled away the foam on all of these stoppings. I do think that's right. And I don't think there is clear testimony in the record about exactly when the stoppings were built this way. Counsel, could I get you to define or give me your definition of traditionally accepted method? I think we took the position in our brief that traditionally accepted methods don't include sealing the perimeter of block stoppings only with foam, and also took the position that the preamble evinces inches and ten at the time it was adopted to list five methods that were traditionally accepted, and things that aren't on that list are not included. Okay, but could you give me a general definition of what traditionally accepted? What I'm trying to get at, obviously, does it include kind of actual factual acceptance by you or not? I don't mean to be evasive. I want to come back, though, to emphasize that not issuing citations or not noticing, I don't think, is acceptance. So absent some kind of... Well, see, and that's why I'm pushing you on it, because I'm trying to figure out if you are making the argument that traditionally accepted method can only be abstract methods, or is there a factual component, and it's just that here it wasn't traditionally accepted because you factually never discovered it. Those seem to be two different definitions to me. Whether you're saying facts can never play, and actually traditionally accepted methods are simply in the abstract. They're A, B, C, D. Or does it have a factual component? Traditionally, you have traditionally accepted. It's just that in this instance, you didn't really traditionally accept it because you didn't know about it. Oh, that's a hard one. I think... Well, you're the one that gave us the problem. I realize this may be an unsatisfying answer. I think that traditionally accepted methods are the abstract methods that MSHA has already identified. I think to the extent that that seems unfair or might risk surprise to mine operators, the way to deal with that, I think, is for the mine operator to raise a defensive notice. Look, you let this go, MSHA, for 20 years, you never... Is that not essentially what they're doing here? It's not what they did here. Instead, they've contested what the regulation means and whether there was, in fact, a violation, which there was. Well, the traditionally accepted method, then, lies in the eyes of the beholder, because I think MSHA has provided, at least in the preamble, some information about what it means. And that is sufficient, I think, to sustain the Secretary's interpretation in this case, which is that foam alone can't be used to seal block stoppings. I recognize that's a little... It may be unsatisfying to accept that interpretation on the basis of a preamble. So, again, we have testimony from MSHA's witnesses explaining that in, for example, ADM Preece's 43 years in the mining industry, that stoppings aren't built like this. And I also think, or I also just want to caution the court... He says they're not built like this when they had been. Well, I suppose he testified that he'd not seen them built like this at other mines, and evidently had not noticed that they were built like this in this mine until the citation was issued. I also, as we did in our brief, just want to emphasize the problematic nature of Peabody's interpretation of traditionally accepted. I don't think they've explained why or how to harmonize their interpretation with the principle that MSHA can't be stopped from enforcing its regulations. Because if... Well, because the use of the term traditionally accepted, the cases that you cite suggest that government can't be stopped. That's a general principle. But do those cases involve language traditionally accepted? Not to my knowledge, they don't involve language that's as traditionally accepted, but neither do the cases limit their holding to the specific standards at issue in those cases. Right, but I guess I'm saying it's a general principle that the government can't be stopped, except when they say they can be stopped in the statute, or not statute, but in the regulation. Well, Peabody just told you, and I think I would agree, that the regulation means traditionally accepted by MSHA, and MSHA has said this is not traditionally accepted. So I don't think that unless MSHA has accepted it... I think the estoppel principle would still apply, because MSHA hasn't kind of written itself out of the estoppel. They've said imperfectly, I will admit. Here's the methods that we think are traditionally accepted, and, you know, to the extent that MSHA didn't issue citations, that is unfortunate, but not fatal to the violation in this case. What else do we look at? With respect to what, Your Honor? The interpretation of this phrase. I think the... Are we in the world of deference, and what kind of deference? Well, we argued in the brief that our, or at the very least, Skidmore deference applies, because we do have evidence from... We're not arguing that the Mine Act itself compels this interpretation. I think our, at least, is appropriate, because for all the reasons explained in more detail in our brief, we have the preamble explaining what MSHA meant at the time, we have MSHA inspectors testifying under oath at the hearing as representatives of the Secretary that this was unacceptable, this was not a traditionally accepted method. I think that's enough indicia, and our brief, which maybe not the strongest indication of what the agency meant in 1996, but the cases that we cite hold that, and our itself holds that the interpretations that are advanced before the Court are still relevant and do deference, and so I think that all of those indicators of what MSHA meant and how the Secretary interprets the regulation indicate that our deference is appropriate, or at the very least, that the Secretary's thought about it has considered the problem, and I think that at least would get us to Skidmore. Are you saying there's a case out there that's interpreted this, that's on all fours with our situation? No, no. I didn't find one. I don't think there is one, but I do think that the general principle of deference that applies, we've identified sources of meaning and sources of interpretation that I think are enough to, well, I hope are enough to convince the Court that the Secretary has, again, given this some thought, has taken a reasonable position, and has acted in the way that he believes will best promote minor safety and health, which of course is what it's all about. I just want to close by mentioning one more point, that even if the Court concluded that MSHA, that the ventilation plan did explicitly permit the use of foam alone to seal block stoppings, although I don't think it does, complying with that ventilation plan would still not be a defense to complying with the standard that MSHA cited. I think that's borne out by this Court's decisions in the Utah Power and Light and in the Plateau Mining cases. So even assuming that, I see I'm almost out of time. May I finish? Even assuming that the ventilation plan did purport to permit this method of constructing stoppings, Peabody still had to comply with the other standard. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted.